8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10  SHERI L. BARRETT,

11         Plaintiff,           No. CIV S-07-1615 EFB

12      vs.

13  MICHAEL J. ASTRUE,
Commissioner of Social Security,

14

15         Defendant.        <u>ORDER</u>
      _____/

16        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

17  ("Commissioner") denying her application for Disability Income Benefits ("DIB") under Title II

18  of the Social Security Act ("Act").  The parties filed cross-motions for summary judgment.  For

19  the reasons discussed below, the court remands this matter for further consideration.

20  I.  <u>BACKGROUND</u>

21        Plaintiff, born February 25, 1959, applied for Disability Insurance Benefits on November

22  13, 2003, alleging she became unable to work on January 1, 2002, due to "Lupus with severe

23  arthritic pain in hands, hips, etc. – weak & extreme fatigue."  Administrative Record ("AR") 60-

24  62, 64.  Plaintiff's initial application for DIB indicated that plaintiff worked in sales at a

25  personnel agency from January 1980 to April 1988, and in customer service at a printing shop

26  ////

from August 1992 to July 2001.[1]  AR 65.  An administrative hearing was held on December 14,

2004, AR 361-79, before administrative law judge ("ALJ") Laura Speck Havens, and an

unfavorable decision by ALJ Havens on March 8, 2005, AR 212-19, who found that plaintiff had

severe impairments but remained capable of performing sedentary work without nonexertional

limitations and therefore not disabled.  The Appeals Council, on December 22, 2005, vacated

that decision on substantial evidence grounds.  The Appeals Council remanded the case and

directed the ALJ to obtain additional medical evidence, obtain further testimony of a vocational

expert, and issue a new decision.[2]  AR 235-37.

---

[1]  *See also* AR 86 (plaintiff worked as a desk clerk/receptionist at a hotel from February 1981 to November 1983, a sales/customer service representative at an employment agency from June 1984 to July 1988, an administrative assistant at IBM/Manpower from January 1991 to July 1992, and as a shipping/customer service representative at a printing shop from August 1992 to June 2001).

[2]  The Appeals Council instructed the ALJ to "reassess the extent of the claimant's manipulative limitations, if any, and arrange for another consultative examination, if necessary," based on the Council's following observations:

> The evidence of record shows the claimant was diagnosed with systemic lupus erythematosus.  Examination by a consulting physician [Anthony Ferrari, M.D.] on July, 2004, agreed with this diagnosis and indicated the claimant's hand grip was markedly decreased and there was symmetrical wasting of the musculature of both hands.  The examiner, however, found no limitations in reaching, handling, fingering or feeling (Exhibit 8F).  The Appeals Council believes that the consulting examiner should be recontacted to explain the absence of any manipulative limitations given the above cited findings.  The state agency examiner also noted in Exhibit 10F, that the claimant's systemic lupus erythematosus resulted in systemic involvement which included most of her joints, including her wrists.  The claimant was noted to have severe morning stiffness with edema of her joints, especially her hands.

> The administrative law judge should reassess the extent of the claimant's manipulative limitations, if any, and arrange for another consultative examination, if necessary.

> Further, the jobs cited by the vocational expert do not correspond to the DOT codes give in the decision . . .

> . . . Upon remand the Administrative Law Judge will:

> Obtain additional evidence concerning the claimant's musculoskeletal

Pursuant to a supplemental administrative hearing on August 23, 2006, AR 380-98, including further testimony of a vocational expert, ALJ Havens issued a new decision on January 25, 2007, again finding that plaintiff is not disabled.[3] AR 18-26. The ALJ made the following specific findings:

> impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513). The additional evidence may include, if warranted and available, a consultative examination and medical source statements about what the claimant can still do despite the impairment.
>
> Give further consideration to the claimant's residual functional capacity. . .
>
> Obtain supplemental evidence from a vocational expert. . .

AR 235-236.

[3] Disability Insurance Benefits ("DIB") are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.* Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.* Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n. 5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146, n. 5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since January 1, 2002, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: systemic lupus erythematosus, arthritis and chronic obstructive pulmonary disease (20 CFR 404. 15020(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. . . . [T]he claimant has the residual functional capacity to sit, stand and/or walk for six hours each in an eight hour workday. She can push, pull, lift and/or carry ten pounds frequently and twenty pounds occasionally. The claimant should avoid very forceful pulling or pushing activities with the bilateral arms and be limited to no more than ten pounds of overhead lifting occasionally. She should not engage in power gripping activities with the bilateral hands and should perform activities involving fine, continuous finger and wrist movements only occasionally. The claimant can use the bilateral hands for light, crude gripping and grasping functions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on February 25, 1959 and was forty-two years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563). The claimant is now forty-six years old, which is defined as a younger individual age 45-49.

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case due to the claimant's age (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from January 1, 2002 through the date of this decision (20 CFR 404.1520(g)).

AR 20-25.

On July 13, 2007, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. AR 7-10.

## II.  ISSUES PRESENTED

Plaintiff contends that (1) substantial evidence does not support the ALJ's finding that plaintiff can perform the exertional demands of light work; (2) the ALJ failed to comply with the remand order of the Appeals Council; (3) the ALJ improperly evaluated the severity of plaintiff's depression; and (4) the ALJ's hypothetical questions posed to the vocational expert failed to include all of plaintiff's supported limitations.

## III.  SUMMARY OF PLAINTIFF'S TESTIMONY[4]

### A.  DECEMBER 14, 2004 HEARING

Plaintiff testified, with the assistance of counsel, that she completed the 11th grade and nearly one year of college.  AR 366.  Plaintiff testified that she left her employment of nine years in 2001 because she had so many absences.  AR 367.  Plaintiff lives with her son and daughter; her son, who is 21, supports everyone; her daughter is homeschooled and achieving honors.  AR 368, 369.

Plaintiff testified that she has lupus, arthritis and chronic obstructive pulmonary disease ("COPD").  AR 368.  She stated that she needs help dressing due to swelling and arthritis in her shoulder.  AR 368-369.  Plaintiff testified that her children do most of the housework, that plaintiff will do small things, like fold towels.  AR 369.  Plaintiff loves to cook but hasn't been able to do much, and she hasn't played golf in four years.  She mostly watches TV.  AR 369.  Plaintiff stated that she smokes half a pack of cigarettes a day, that she "has to" quit, and hadn't realized that "lupus was taking away my lungs."  AR 370.  Plaintiff drives, but her children do most of the driving.  AR 370-371.  Plaintiff generally sleeps four hours, sometimes up to eight hours, and uses sleeping medication.  AR 371.

Plaintiff testified that it has been difficult to obtain adequate medical care as a lupus patient with MediCal.  AR 371- 372.  Plaintiff stated that she went to mental health two weeks

---

[4]  Because of the findings herein the court does not recount the testimony of the vocational expert at either hearing.

previous, and would have to wait until the beginning of the year to see a therapist; plaintiff stated that she intended to pursue both medication and therapy. AR 372.

Plaintiff testified that she takes the following medications: Tylenol codeine, Motrin 800 mg, Naprosyn, Advant inhaler, and over-the-counter ("OTC") sleeping medication. AR 373. Plaintiff testified that she takes the Tylenol codeine at night. *Id.* Plaintiff testified that she easily becomes short of breath, "just getting up and walking to the refrigerator." She stated that she could sit for up to an hour and a half, but has joint pain. Plaintiff testified that she has pain in all of her joints, especially her hands and shoulders. AR 374. Asked what the pain feels like, plaintiff stated, "[M]y skin turns really read and hot, it swells. Maybe like a vice tightening." *Id.* Plaintiff testified that the pain "comes and goes, [b]ut it's there more than it's not there," with an average pain level of "7" on an ascending scale from 0 to 10. AR 375.

B.    AUGUST 23, 2006 HEARING

This hearing followed two significant events: plaintiff's reported suicide attempt in August 2005, and plaintiff's myocardial infarction in February 2006, both discussed *infra*.

Plaintiff testified, with the assistance of counsel, that her condition had worsened: she has greater shortness of breath associated with COPD, and had a heart attack with stent implacement in February 2006. AR 384-385. Plaintiff testified that she can walk about 10 to 20 steps before she's "wheezing pretty good." AR 390. Plaintiff stated that her heart "feels fine," that "[i]t always did. I was real surprised to have a heart attack but there's been a lot, under a lot of stress." AR 385.

Plaintiff testified that she and her son were renting two rooms in a house. The landlady and plaintiff's son do the cleaning and cooking. AR 386. Plaintiff stated that she can dress herself, but can't bathe herself. She watches about two hours of TV a day; the news. AR 386-387. She has not driven in three or four years; she does not own a car, and she gets rides to her appointments; she stated that it would be "really hard" to drive due to "all the pain in my ankles, my hips, it's hard for me to sit for long periods." AR 387. Plaintiff stated that she goes to

church occasionally.  *Id.*

She can sit for about an hour comfortably.  She can lift about five to six pounds, the weight of her dog.  AR 390.  Plaintiff testified that she has pain in her fingers, wrist[s], shoulders, hips, knees, ankles.  AR 390.  Asked what the pain feels like, plaintiff answered, "It's a throbbing, like something squeezing on your bones, like the vise kind of grabbing, you know, it's tightening.  There's a lot of heat."  AR 390-391.  Plaintiff testified that the pain comes and goes, that the average pain level, with medication, is probably a "6."  AR 391.  Plaintiff testified that she has problems with both hands and, in response to questions, stated that she could pick up a cup but not use a keyboard.  *Id.*

Plaintiff stated that she usually sleeps about four hours at night, but wakes up shaking.  AR 388.  Plaintiff testified that she's been having a lot of panic attacks.  AR 391.

The ALJ read plaintiff's list of medications, which she acknowledged:  Toprol (beta-blocker), Zocor (treats cholesterol), Plavix (blood thinner), Xanax (treats panic disorders), Aspirin, and Elavil (antidepressant).[5]  AR 389.  Plaintiff testified that the pain medications give her stomach pain, and the Elavil dries her mouth.  AR. 389.  Additional medications are the painkillerl Vicodin (1000 mg four times a day), Methotrexate (an oral chemotherapy or antimetabolite therapy used to treat lupus, cancer and other serious conditions),[6] and Ambien, for sleeping.  AR 391-392.  Plaintiff testified that she hadn't been to mental health for about six months, because she can get the same medication from her physician. AR 388.

////
////
////
////

---

[5]  These prescriptive descriptions are taken from the Physicians' Desk Reference ("PDR"), 63rd ed. (2009).

[6]  *See*, *e.g.*, http://www.rxlist.com/trexall-drug.htm (trademarked methotrexate).

1  IV.  <u>MEDICAL EVIDENCE</u>

2      A.  <u>TREATMENT HISTORY</u>

3          On December 1, 2000, plaintiff was seen by rheumatologist Albert A. Ferrari, M.D.,[7] at

4  the request of her treating physician, Dr. Harvey Hashimoto, to ascertain whether plaintiff's

5  discoid lupus erythematosus ("DLE"),[8] diagnosed in 1987, had progressed to systemic lupus

6  erythematosus ("SLE").[9]  AR 176-179.  Dr. Ferrari noted that plaintiff's main symptom in 1987

7  had been a rash, and that she had been prescribed Plaquenil (antirheumatic drug), which she took

8  seasonally.   Approximately 1996, plaintiff developed hives when taking Plaquenil, and it was

9  discontinued.  Thereafter, as noted by Dr. Ferrari:

10          Within several months she began noticing increasing lesions in her arms,
            markedly pruritic and verrucous in form with scarring.  She has been followed by
11          Dr. Khourdajl, who just injects them with steroids with equivocal results.
            Approximately 2 years ago she began having joint pain, especially involving her
12          right thumb and right knee, and this remitted spontaneously.  Recently she has
            had pain in her right hip, which remitted, and now she is having some pain in her

13

14          [7]  The record contains the reports of two Dr. Ferrari's, both at the same address.  *See* AR
15  376 (plaintiff's counsel confirms these are two different physicians).  Plaintiff first treated with
    Dr. Albert Ferrari, and then with Dr. Anthony Ferrari.

16          [8]  "Discoid lupus erythematosus (DLE):  DLE, also sometimes called chronic cutaneous
    lupus erythematosus, is a set of skin changes that can occur as part of lupus, with or without
17  systemic involvement. Skin lesions begin as erythematous plaques and progress to atrophic
    scars. They cluster in light-exposed areas of the skin, such as the face, scalp, and ears. Untreated,
18  lesions extend and develop central atrophy and scarring. There may be widespread, scarring
    alopecia. Mucous membrane involvement may be prominent, especially in the mouth."  *Merck*
19  *Manual*,18th Edition, Merck & Co., Inc. (2006), at p. 269.

20          [9]  "Systemic lupus erythematosus is a chronic, multisystem, inflammatory disorder of
    autoimmune etiology, occurring predominantly in young women. Common manifestations may
21  include arthralgias and arthritis; malar and other skin rashes; pleuritis or pericarditis; renal or
    CNS involvement; and hematologic cytopenias.
22          . . . Clinical findings vary greatly. SLE may develop abruptly with fever or insidiously
    over months or years with episodes of arthralgias and malaise. Vascular headaches, epilepsy, or
23  psychoses may be initial findings.  *Manifestations referable to any organ system may appear.*
    Periodic exacerbations (flares) may occur
24          Joint symptoms, ranging from intermittent arthralgias to acute polyarthritis, occur in
    about 90% of patients and may precede other manifestations by years. . . . [Other symptoms may
25  include] Skin lesions . . . . Cardiopulmonary symptoms . . . Generalized adenopathy . . . .
    Neurologic symptoms . . . . Renal involvement . . . .Hemotologic manifestations. . . . GI
26  manifestations."  *Merck Manual*, at p. 266-267 (emphasis added).

left thigh. [¶ ] She denies iritis, Raynaud's phenomenon, pleurisy, fevers, photosensitivity, dry eyes, dry mounth, sores on her mouth.

AR 176.

Dr. Ferrari noted on examination that plaintiff had "slight swelling of the third PIP joint but no tenderness" on her left hand, and that the "medial aspect of the left ankle is tender but good range of motion." AR 178. Dr. Ferrari diagnosed "a severe form of discoid lupus with active lesions on her arms," and scarring on her face, without significant photosensitivity. "Aside from arthritic complaints, there is no other evidence of organ involvement." *Id.* Dr. Ferrari prescribed a trial of methotrexate, and indicated that plaintiff would be seen in approximately one month to discuss the results of her lab tests. *Id.* Dr. Ferrari diagnosed discoid lupus erythematosus, "rule out" systemic lupus erythematosus. *Id.*

Treatment notes of Dr. Albert Ferrari dated January and February 2002 indicated a diagnosis of "severe" discoid erythematosus, and increasing prescription amounts of methotrexate. AR 174, 175.

Treatment records recommence July 2003, with plaintiff establishing as a new patient at the University of California Davis Medical Center. AR 102-124. Plaintiff reported that she had recently developed nodular erythematous hyperkeratotic lesions on both upper extremities, arthritic symptoms in her knees, hair loss, and a photosensitive rash. AR 124. The physician diagnosed plaintiff with discoid lupus. *Id.* On August 1, 2003, plaintiff reported fatigue and weight loss. AR 120-22; *see also* AR 116-117.

Lab results indicated in pertinent part significant nucleolar pattern seem primarily in scleroderma and/or polymyositis or other connective tissue diseases, AR 113, 111; and increased levels of anticardiolipin antibodies, AR 105, 106. Dermatologic biopsies were consistent with discoid lupus. AR 109-10. Treatment notes from October 2003 indicate plaintiff complained of joint pain affecting her hands, wrists, shoulders and ankles that lasted "anywhere from [a] few hours to days" and a cough that lasted 10-12 days ("patchy alopecia"). AR 118.

On October 24, 2003, Rheumatologist Gurtej Cheema, M.D., of UC Davis's Department of Internal Medicine, indicated that plaintiff "has a long history of discoid lupus, which has recently been suspected to have transformed into a systemic form."  AR 102.  Dr. Cheema indicated that plaintiff "has been noncompliant and has not seen physicians for quite some time," but noted also that "[s]he lost her house and business and has become homeless about two weeks ago.  She is now living in her car with her daughter and son.  She is being helped by a few friends."  AR 102, 103.  Dr. Cheema recounted plaintiff's statements that "in about January of 2003, she developed pain in her hands, especially the small joints of the fingers, wrists, shoulders, ankles, and the knees."  AR 203.  Plaintiff stated that the pain "affects at least one joint at any given time" and that "it takes anywhere between a day to several days for it to resolve."  *Id.*  He also noted that plaintiff had been suffering from an upper respiratory tract infection over the past 10 to 12 days.  *Id.*  Plaintiff complained in pertinent part of weight gain, fatigue, generalized weakness, occasional dizziness, pain and tingling in her hands, ringing in her ears, decreased visual acuity, night sweats, wakefulness at night to urinate, photosensitivity, and morning stiffness lasting several hours, primarily located in her fingers, wrists, shoulders, ankles, and knees.  AR 103.

Dr. Cheema's examination revealed patchy alopecia (hair loss), bronchial breathing, tenderness of the right shoulder, significant tenderness in her MCP (metacarpal phalangeal) as well the PIP (posterior interphalangeal) joints of both hands, tender ankles, absent deep tendon reflexes bilaterally in knees and ankles, and lesions on her face and arms.  *Id*.

Dr. Cheema assessed that plaintiff's discoid lupus had recently transformed to systemic lupus, noting that she met the "basic criteria [of] a discoid skin rash, arthritis, alopecia, positive ANA, and anti-DNA antibodies."  AR 104.  Dr. Cheem prescribed chloroquine sulfate (antirheumatic), and noted she should have ophthalmologist evaluations every six months to a year.  *Id.*

////

The records of treating physician Dr. Joseph Nguyen, D.O., of Lodi Memorial Hospital, span December 9, 2004 to February 27, 2006.  AR 206-209, 283-309.  In December 2004, plaintiff complained of fatigue, joint pain, and depression.  Plaintiff was prescribed Motrin 800 mg, Tylenol #3, and Naprosyn.  AR 207, 309.

Pertinent treatment notes from Dr. Nguyen include plaintiff's complaints of increased pain in all joints and all over body, AR 302 (October 2005); COPD, AR 305, 303 (October 2005); depression, AR 309 (December 2004, referred to Lodi Mental Health), AR 308 (January 2005), AR 307 (March 2005), and AR 303 (October 2005); prescriptions for methotrexate, AR 309 (December 2004), AR 302 (October 2005), AR 301 (November 2005); Tylenol #3, AR 301 (November 2005); increased to Norco, AR 300 (December 2005), AR 299 (January 2006); and Vicodin, AR 299 (January 2006); Ambien for sleep, AR 308; Elavil for depression, AR 307 (March 2005, "working well"); and Nebulizer for treatment of COPD, AR 296.  Plaintiff was told to stop taking methotrexate due to abnormal lab tests in November 2005.  AR 286. Abnormal cardiac panels were returned in February 2006, consistent with plaintiff's myocardial infarction. AR 292-293.  Discoid lupus is diagnosed throughout the records, sometimes referenced as SLE.

Dr. Nguyen completed forms noting that it was medically necessary for plaintiff to have "extra air conditioning and/or electric heating" in her home due to "severe lupus outbreaks, very sensitivity to temperature changes, COPD (chronic obstructive pulmonary disease)," in order for plaintiff to obtain adjustment of local utility rates.  AR 206-07; see also AR 297-298 (January 2006).  Plaintiff was  prescribed a scooter for ambulation, based on her symptoms of "COPD, SLE w/ RL Arthritis," in October 2005.  AR 304.

Plaintiff treated at San Joaquin County Mental Health from January 6, 2005 to February 7, 2006.  AR 260-281.  Plaintiff contacted Mental Health December 2004, AR 281, and was initially assessed January 6, 2005.  AR 265-281.  A Mental Health Clinician noted plaintiff's complaints of depression over the past four years associated with her physical problems and

financial status. Plaintiff stated that "she has pain and feels ill much of the time by even when she feels physically fine, she is unmotivated to do anything." AR 272. The Clinician related the assessment of plaintiff to the following based on the American Psychiatric Association's multiaxial framework:[10]

| | |
|---|---|
| Axis I: | Depressive Disorder NOS [not otherwise specified] |
| | Mood Disorder Due to Medical Condition (Lupus) |
| Axis II: | No diagnosis |
| Axis III: | Lupus by client report |
| Axis IV: | Problems with primary support group, social environment, education, occupation, housing, economic, access to health services |
| Axis V: | GAF 49[11] |

AR 272-273.

////

////

////

////

---

[10] The American Psychiatric Association's Multiaxial Assessment is set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th ed. 1994), at pp. 25-33:

| | |
|---|---|
| Axis I: | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II: | Personality Disorders |
| | Mental Retardation |
| Axis III: | Medical Conditions |
| Axis IV: | Psychosocial and Environmental Problems |
| Axis V: | Global Assessment of Functioning ("GAF") |

The Global Assessment of Functioning ("GAF") Scale is a tool created by the American Psychiatric Association to assess "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV, at p. 34. When two GAFs are provided, the first references current functioning or "on admission," while the second may reference "at discharge" or "highest level past year." *Id.* at p. 35.

[11] A GAF 49 (41 to 50) denotes "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV, at p. 34.

On January 14, 2005, plaintiff was evaluation by a psychiatrist, Dr. James R. Young, M.D., who made the following diagnosis:

Axis I:     Major Depressive Disorder[12]
Axis II:    No diagnosis
Axis III:   SLE
Axis IV:    SLE
Axis V:     GAF 35[13]

AR 265-268.

Dr. Young prescribed Elavil, and a follow up appointment in 30 days. AR 267.

While several therapy interventions were proposed, AR 279, a notation dated June 16, 2005, provides, "Ct. is benefitting from meds; not in therapy, meds- only." AR 278-280; *see also* AR 264.

However, a later notation, dated September 6, 2005 provides:

Call from patient. She states an August 23, 2005 in the evening she took a bottle of Restaral [Restoril, a sleeping aide] 30 pills. Her son found her and kept her awake. She didn't go the hospital. She state she was feeling really bad because they got an eviction notice. It felt like nothing was working for her. She states she is [] []now no suidical thoughts. She just wanted to let us know what she had done.

AR 262.

Plaintiff's mental health file was closed September 2006, based on "no show" appointments, and difficulties contacting plaintiff since October 2005, despite an interim appointment with Dr. Young in August 2006. AR 262.

Dr. Roy F. Kaku, treated plaintiff for her myocardial infarction on February 15, 2006. AR 311-29. A stent was placed to correct "severe single-vessel coronary artery disease," AR

---

[12] The notation appears to provide, "MD R/O /s psychotic" and references DSM Code 296, which encompasses Major Depressive Disorders. *See* DSM-IV, at p. 20, and AR 266.

[13] A GAF 35 (31 to 40) denotes "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV, at p. 34.

1  316. Dr. Kaku noted that plaintiff was a smoker and encouraged her to stop; that plaintiff had

2  hyperlipdemia, for which he prescribed Lipitor, that plaintiff had chronic arthritic pain associated

3  with SLE, and hypertension.

4        B. <u>CONSULTATIVE EXAMINATIONS</u>

5        On February 17, 2004, plaintiff was evaluated by licensed psychologist David C.

6  Richwerger, Ed.D., of Amberstone Medical Group, at the request of the Commissioner.  AR 125-

7  31.  Plaintiff reported that "she has some depression and memory loss" which started about five

8  years ago, but that "her main problem is pain in the joints and fatigue."  AR 125.  Plaintiff

9  denied auditory or visual hallucinations, but stated that she "has troubling thoughts and

10  sometimes feels isolated and depressed."  AR 126.  Plaintiff told Dr. Richwerger that "she does

11  errands, shopping, driving, and cooking,"  "takes care of her own personal needs," handles her

12  own financial affairs," "is able to move about alone," and "gets along good with family,

13  relatives, friends, and neighbors."  AR 127.  Dr. Richwerger noted that plaintiff's "[t]hought

14  processes were clear, rational, detailed, not disorganized, and not tangential," that her

15  "[u]nderstanding of instructions was within normal limits for both simple and complex tasks,"

16  and that "[t]here was no evidence of hallucinations, delusion, bizarre behavior, or response to

17  internal stimuli."  AR 127-28.

18        Dr. Richwerger diagnosed plaintiff with "Adjustment disorder with depressed mood,

19  moderate, secondary to health concerns" and a GAF of 70,[14] and stated that her prognosis was

20  "fair to good."  AR 130.  He added that plaintiff appears to have no impairment in her abilities to

21  perform detailed and complex tasks, to perform simple and repetitive tasks, to perform work

22  activities on a consistent basis, to perform work activities without special supervision, to

23  understand and accept instructions from supervisors, to maintain regular attendance in the

24

25      [14]  A GAF 61 to 70 denotes "Some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some

26  meaningful interpersonal relationships."  DSM-IV, at p. 34.

workplace, and to deal with the usual stresses encountered in competitive work; appears to have a slight impairment in her abilities to complete a normal workday or workweek without interruption from a psychiatric condition and to interact with coworkers and the public; and appears to be capable of managing her own funds.  AR 130-31.

On July 4, 2004, internal medicine physician, Anthony Ferrari, M.D., completed a consultative evaluation at the request of the Commissioner, in which he indicated that "in 1992, it was determined" that plaintiff has systemic lupus erythematosus, including arthritis in her wrists, hands, knees, and shoulders.  AR 161, 164.  Upon examination, Dr. Ferrari observed that plaintiff "looks older than her stated age," "obviously has many lesions of her face with considerable scarring," also present on her arms; and that she spoke with "a husky voice."  AR 163.  He noted "some inspiratory wheezes bilaterally;" minimal tenderness to the back with 80% of normal range of motion; "markedly decreased" grip strength; diminished range of motion of the shoulders, right elbow, wrists, and knees; tenderness over the shoulder joints, hands and knees; left eye acuity of 20/70 and right eye acuity of 10/30.  AR 163, 164, 172.  He opined that plaintiff could walk up to 4 hours on a noncontinuous basis; stand up to 4 hours on a noncontinuous basis; sit up to 6 hours on a noncontinuous basis; lift up to 10 pounds occasionally; bend occasionally; had no limitations in reaching, handling, fingering, and feeling; and was unable to kneel, crawl, crouch, balance, or climb, and should avoid heights.  AR 164-65, 169.

On February 14, 2006 (the day before plaintiff's heart attack), at the request of the Commissioner, plaintiff underwent a "comprehensive orthopedic evaluation" by Steve McIntire, M.D., of MDSI Physician Services.  AR 252-59.  Dr. McIntire indicated that "[i]t would be worthwhile to review all the relevant records."  AR 252.  Plaintiff described hand pains occurring diffusely with associated finger swelling, discomfort over both wrists, shoulder pains, and morning stiffness.  *Id.*  On examination, Dr. McIntire found that plaintiff had full range of motion of both shoulders, no significant discomfort on range of motion testing, and no signs of

1 impingement or apprehension. AR 254. He noted, however, diffuse tenderness over both

2 shoulders, tenderness on palpation over the joints of all digits of both hands, and some

3 discomfort with range of motion testing of her wrists. *Id.* He concluded that:

> Given the above findings, the claimant would have manipulative
> limitations. She should not engage in power gripping activities
> with the hands. Activities requiring fine, continuous finger and
> wrist movements such as typing or keyboard work should be
> limited to an occasional basis. She would be able to utilize the
> hands for light, crude gripping and grasping functions. She should
> not lift or carry more than 10 pounds frequently and 20 pounds
> occasionally. . . . She should avoid very forceful pulling or
> pushing activities with the arms. Overhead lifting should be
> limited to not more than 10 pounds on an occasional basis. The
> current examination itself does not point to limitations in terms of
> time sitting, standing, or walking. There are not postural
> limitations suggested by the present examination.

11 AR 254-55.

12     C. <u>STATE AGENCY REVIEWS</u>

13     In a March 9, 2004 Psychiatric Review Technique Form, Dr. Donald R. Walk, M.D.,

14 indicated that plaintiff's impairments, based on consideration of affective disorders (depressive

15 order, finding evidence of sleep disturbance, decreased energy, and difficulty concentrating or

16 thinking), were "not severe" and that she had only a mild restriction of her daily living activities,

17 mild difficulties in maintaining social functioning, and mild difficulties in maintaining

18 concentration, persistence, or pace. AR 134-146. Dr. Walk concluded that plaintiff "is adjusting

19 successfully to a medical problem." AR 146.

20     In a March 11, 2004 Physical Residual Functional Capacity Assessment, Dr. Mark

21 Tambellini, M.D., while finding plaintiff's allegations credible, and based upon findings of

22 lupus, severe arthritis pain, and fatigue determined that plaintiff could occasionally lift and/or

23 carry (including upward pulling) twenty pounds; frequently lift and/or carry (including upward

24 pulling) ten pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-

25 hour workday; and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday.

26 AR 149. He also found that plaintiff was not limited in her upper or lower extremities in pushing

and/or pulling (including operation of hand and/or foot controls); she could occasionally climb a ramp/stairs, balance, stoop, kneel, crouch, or crawl; her feeling was unlimited; her handling (gross manipulation), fingering (fine manipulation), and reaching all directions (including overhead) were limited, but are "able to be done . . . on frequent basis"; and she had no visual, communicative, or environmental limitations.  AR 149-52

In a July 19, 2004 Physical Residual Functional Capacity Assessment, State Agency physician Dr. Sudhir Jaituni, M.D., found that plaintiff could lift and/or carry no more than 10 pounds on an occasional or frequent basis; stand and/or walk (with normal breaks) for a total of 4 hours in an 8-hour workday; and sit (with normal breaks) for a total of 6 hours in an 8-hour workday.  AR 183.  Dr. Jaituni found that plaintiff was not limited in her upper or lower extremities in pushing and/or pulling (including operation of hand and/or foot controls); she could occasionally climb a ramp/stairs, stoop, kneel, crouch, or crawl, and could frequently balance; she had no manipulative, visual, or communicative limitations; and her only environmental limitation was that she should avoid concentrated exposure to heights.  AR 183-89.

V.      LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

1    *Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

2        "The ALJ is responsible for determining credibility, resolving conflicts in medical

3    testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

4    2001) (citations omitted). "Where the evidence is susceptible to more than one rational

5    interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

6    *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

7    VI.  <u>ANALYSIS</u>

8        Like the blind men and the elephant, the many medical opinions of record concerning

9    plaintiff's mental and physical impairments require a comprehensive review and opinion by a

10   medical expert with a specialization in lupus. *See* 20 C.F.R. § 404.1527(f)(2)(iii) (the ALJ may

11   "ask for and consider opinions from medical experts" on the nature and severity of impairments,

12   and whether impairments meet or equal the requirements of a listing).

13       The court's review of this record led immediately to consideration of Listing 14.02,

14   Systemic Lupus Erythematosus, and its list of "other body systems" typically involved in the

15   disease as it progresses.[15] *See also*, n. 9, *supra* (*Merck Manual*). Based on the Commissioner's

16

17       [15] As set forth in the introductory note to 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00D:

18       D.   How do we document and evaluate the listed autoimmune disorders?

19       1. Systemic lupus erythematosus (14.02).

20       a. General. Systemic lupus erythematosus (SLE) is a chronic inflammatory
21       disease that can affect any organ or body system. It is frequently, but not always,
         accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise,
         involuntary weight loss). Major organ or body system involvement can include:
22       Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis,
         pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia,
23       leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures),
         mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic
24       brain syndrome, psychosis), or immune system disorders (inflammatory arthritis).
         Immunologically, there is an array of circulating serum auto-antibodies and pro-
25       and anti-coagulant proteins that may occur in a highly variable pattern.

26       b. Documentation of SLE. Generally, but not always, the medical evidence will

                                                      18

own regulations, it is imperative to consider the reasonable possibility that *all* of plaintiff's symptoms – including but not limited to joint pain, skin lesions, pulmonary and cardiovascular symptoms, depression, anxiety, fatigue, hair loss and photosensitivity – are the result of SLE. While this possibility was suggested by a member of the Commissioner's staff in July 2004, *see* AR 190, there has been no followup.

Rather, the ALJ's consideration of whether plaintiff's impairments meet or equal a listed impairment was general and cursory, finding only that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments," based on the singular rationale, "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." AR 22. The inadequacy of this assessment is underscored by the parsing of plaintiff's symptoms throughout the decision. For example, the ALJ observed that following plaintiff's "cardiac catheterization and implantation of a stent in February 2006 [] all treatment records and her testimony indicate that she is doing well and her cardiac symptoms have not returned." AR 24. Similarly, the ALJ found that plaintiff's depression was not severe because, considered in isolation and relying on the only moderate GAF score (summarily rejecting the exceptionally low GAF scores opined by plaintiff's treating providers), it "does not impose any significant vocationally relevant limitations." AR 22. On a record such as this, where all of plaintiff's myriad of symptoms may originate from one progressive disease process such as Systemic Lupus Erythematosus, it is incumbent on the Commissioner to obtain one comprehensive medical opinion.

The court finds, therefore, insufficient evidence to support the ALJ's step-three finding, and remands on this basis.

////

show that your SLE satisfies the criteria in the current "Criteria for the Classification of Systemic Lupus Erythematosus" by the American College of Rheumatology found in the most recent edition of the Primr on the Rheumatic Diseases published by the Arthritis Foundation.

Several problems also beset the ALJ's analysis of plaintiff's depression, credibility and residual functional capacity. While the court's review is not exhaustive, several matters are significant, again due to a selective parsing of the record.

As a threshold matter, the record is clear that plaintiff's depression is a severe impairment. The ALJ's reliance on the report of Dr. Richwerger, who found a GAF 70, and her implicit rejection of the low GAF scores accorded to plaintiff by her treating psychiatrist (GAF 35) and social worker (GAF 49), has no other support in the record. Moreover, the ALJ ignored the treatment note of plaintiff's self-reported suicide attempt. AR 262. While this was not hard evidence, it warranted consideration. Nor does the record support the ALJ's rationale for discrediting plaintiff's alleged depression because she missed mental health appointments and did not participate in therapy. AR 22. At the outset, plaintiff's treatment was designated "meds only," AR 264, 278-280, and she testified that she did not go to mental health because she was able to obtain her medication, Elavil, from her primary care physician, AR 388. (The ALJ also found, inconsistently, that plaintiff *was* seeing a mental health physician. AR 23.).

Accordingly, based on the weight of the record concerning plaintiff's alleged depression, the court finds that it has "more than a minimal effect on [her] ability to work," *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988), and is therefore severe within the meaning of the Act.

Further, the ALJ's current finding that plaintiff can perform light work is perplexing in light of her initial finding that plaintiff could perform only "a significant range of sedentary work" requiring a sit/stand option. To find that plaintiff can perform light work, the ALJ rejected the July 2004 opinion of State Agency physician Dr. Jaituni that plaintiff can perform only sedentary work, AR 24, 183, and relied on Dr. McIntire's assessment. However, Dr. McIntire examined plaintiff the day before her heart attack, thus failing to consider this factor. Dr. McIntire also failed to consider the exertional impact of plaintiff's COPD, which the ALJ

////

////

independently found to be severe.[16]  AR 20.  Even Dr. McIntire realized, "It would be worthwhile to review all the relevant records."  AR 252.

In discrediting plaintiff's testimony concerning her limitations, the ALJ made several statements that are simply contrary to the actual testimony, including:  (1) "[s]he rents a room out to a boarder who helps with cooking and chores," AR 23 (plaintiff actually testified that *she is the boarder*, AR 386); (2) "[s]he has no hobbies and watches television and exercises during the day," AR 23 (plaintiff actually testified that *she does not exercise*, AR 387); and (3) she "continues to see her primary care physician, Dr. Nguyen, and sees a physician for mental health treatment," AR 23 (plaintiff, in fact, testified that she does *not* see a mental health provider and that she obtains her medication from Dr. Nguyen, AR 388).

The ALJ also discredited plaintiff's subjective complaints because "the treatment records show some concerns that she was abusing narcotic pain medications and recommended that she return to using methotrexate."  AR 23.  The ALJ appears to have misread the record.  She apparently references Dr. Nguyen's treatment note (at AR 301), which indicates that plaintiff agreed to stop using Xanax, because it caused her increased anxiety.  *Id.*  Dr. Nguyen notes increased "LFTs" (liver function tests) and questions whether this may be attributable to high doses of tylenol or methotrexate.  *Id.*  He adds, "Pt instructed at length she needs close monitoring while on MTX."  *Id.*  Significantly, methotrexate is a form of chemotherapy, not interchangeable in subjective experience with narcotic pain medication, and all literature relative to methotrexate cautions careful monitoring of the patient's liver functions.  Hence, these treatment notations do not support the ALJ's finding of possible narcotic abuse, nor does any other treatment record reviewed by this court (the notable related exception being plaintiff's

----

[16]  Moreover, in order to rely on Dr. McIntire's narrative report, particularly its statement of manipulative restrictions (as required by the Appeals Council remand order and in lieu of obtaining further records from Dr. Ferrari), AR 254-255, the ALJ was required to reject Dr. McIntire's companion RFC form which found no such restrictions, AR 258.  AR 24.  Such parsing significantly undermines the ALJ's RFC findings.

apparent suicide attempt).

The ALJ also discredited plaintiff's subjective complaints because she failed to seek any treatment from October 2003 to December 2004, and had periods of apparent medical noncompliance. However, as Dr. Cheema noted October 2003, plaintiff was then "noncompliant and has not seen physicians for quite some time," but "[s]he lost her house and business and has become homeless about two weeks ago. She is now living in her car with her daughter and son. She is being helped by a few friends." AR102, 103. As plaintiff herself noted, "It's hard to see anybody with MediCal. Most GP doctors won't even touch me because I have lupus. And then there's a lot of internists and rheumatologists that don't take MediCal. It's hard." The ALJ must fairly consider plaintiff's entire situation.

Finally, the ALJ discredited plaintiff's subjective complaints because "the claimant often reported that she was doing well." AR 23-24. However, because the course of SLE is "usually chronic, relapsing, and unpredictable," *Merck Manual*, at p. 268, intermittent periods of reduced symptomology do not, in themselves, diminish plaintiff's credibility.

These matters must be realistically assessed on remand. Hence, the parties' current disagreements concerning the details of the Appeals Council remand order, and whether it was mandatory or discretionary, lose significance on remand; while their disagreements concerning the significance of plaintiff's use of a scooter and parking placard will necessarily be resolved on remand.

VII.   CONCLUSION

For the foregoing reasons, the court finds that the ALJ's decision is not supported by substantial evidence. This case will be remanded to the Commissioner for reconsideration commencing at step three, with the inclusion of plaintiff's depression among her supported severe impairments. The Commissioner shall obtain all current medical records and order further necessary consultative examinations. The Commissioner shall obtain the assistance of a medical expert who shall review the entire record and specifically consider whether plaintiff's

combined impairments meet or equal the criteria for Listing Impairment 14.02. Should the Commissioner conclude that plaintiff's combined impairments fail to meet the criteria for this or any other listed impairment, and the analysis proceeds to steps four and five, the assessment of plaintiff's residual functional capacity shall include all of plaintiff's supported exertional and nonexertional limitations.

Additionally, it is the opinion of this court that another administrative law judge should be assigned to this case on remand to ensure a fresh review of all the evidence.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is granted,

2. Defendant's cross-motion for summary judgment is denied,

3. This action is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. 405(g), for further consideration consistent with these findings; and

4. The Clerk is directed to enter judgment for plaintiff.

DATED: March 31, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE